## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Vincent Moore,                                    Case No. 2:15-cv-13319

          Petitioner

     v.                                    **ORDER**

Thomas Mackie, Warden,

          Respondent

This is a state prisoner's habeas corpus case under 28 U.S.C. § 2254.

In 2011, a jury in Wayne County, Michigan convicted the petitioner, Vincent Moore, of felony murder and armed robbery. The state trial court sentenced Moore to life imprisonment for murder and an indefinite term of fifteen to thirty years' imprisonment for armed robbery.

Having exhausted his state-court remedies, Moore now seeks a writ of habeas corpus.

Pending is respondent's renewed motion to dismiss the petition as untimely under 28 U.S.C. § 2244(d). (Doc. 15). For the following reasons, I grant the motion in part and deny it in part.

### Background

Viewed in the light most favorable to the verdict, the prosecution's evidence permitted the jury to find that Moore and several unnamed (and uncharged) confederates set up a proposed drug deal with William Ferguson; that one those confederates shot Ferguson after it was confirmed that Ferguson had a large amount of cash; and that Moore took the money from Ferguson's pocket after he had been shot:

On September 4, 2010, the victim, William Ferguson, his girlfriend, Heather Farnsworth, and her friend, Krystal Breck, drove from Huntington, West Virginia to Detroit. Farnsworth and the victim had made arrangements to meet with defendant, Vincent Moore, and purchase 400 Oxycontin pills. Farnsworth had met defendant in West Virginia and had conducted drug purchases from him since then but this was the first time she and the victim had traveled to Detroit to purchase narcotics from defendant.

The victim and his friends arrived in Michigan and Farnsworth contacted defendant to arrange for a place to meet. At approximately 9:30 a.m., Farnsworth parked the group's Chevrolet Impala at a Burger King restaurant near Gratiot Avenue in Detroit in order to wait for defendant. Defendant arrived 10 to 15 minutes later in a dark-colored Impala. Another male was with defendant in the car. Defendant spoke to Farnsworth and told her to follow him to a gas station. At the gas station, defendant went into the store. Defendant exited the store with a juice bottle. Defendant spoke to Farnsworth and told her to follow him to a house. At the house, defendant went inside for a short period of time. Defendant returned to his car and told Farnsworth to follow him to another house. Defendant led Farnsworth, the victim, and Breck to a house at 10643 McKinney Street in Detroit.

At the house on McKinney, defendant spoke to Farnsworth while she was still in her vehicle. Defendant offered Farnsworth some marijuana and talked with her for a few minutes. Defendant then led Farnsworth, the victim, and Breck inside the house. The male that accompanied defendant to meet Farnsworth stayed in the dark-colored Impala. Inside the house was another male. The group talked inside the house for approximately 15 minutes. During this time, defendant was drinking from his bottle of juice and used his phone. Farnsworth left the house to go to her car and get cigarettes. The victim and Breck stayed inside the house with defendant and the other male. Outside, Farnsworth recorded the license plate number for the dark-colored Impala because she had a strange feeling that something was going to happen. Farnsworth returned to the house and gave defendant and the other man a cigarette. Farnsworth and the victim went into a separate room to count the money they intended to use to purchase the Oxycontin. Between Farnsworth and the victim, they had $14,000. The victim put the money into his pocket and Farnsworth told defendant that they were ready to purchase the pills.

Defendant talked with Farnsworth and the victim for a short period of time before indicating that he was going outside to get some marijuana. Defendant walked toward the rear of the house. A few seconds later, several men rushed into the house carrying guns. The other man in the house also grabbed a gun. Farnsworth believed that all the weapons were long guns. Farnsworth and Breck were ordered to get down. Farnsworth heard one of the men then direct another to hit the victim in the head. Farnsworth heard a loud smack and saw the victim fall down. The victim got back up and moved toward the front door. At that point, gunfire

started. The victim fell again. Defendant, carrying a long gun, walked toward the victim. Defendant took the money from the victim and went toward the rear of the house again. The other men then left the house. Neighbors across the street from the house heard the gunshots and looked outside. Two men with their faces obscured walked from the side of the house carrying long guns. The two men got into an Impala. The Impala went in reverse around the corner toward the side of the house and out of the neighbors' vision.

At least 13 ammunition casings were found inside of the house. The victim was shot four times. One bullet struck the victim in the back of the head and exited out the other side of the head after traveling through the brain. Another bullet struck the victim in the chest perforating both lungs and the pericardial sack. A third bullet hit the victim in the abdomen and a forth [*sic*] bullet broke the victim's left femur. The victim died from his wounds. Investigation of the evidence found at the murder scene revealed that the casings found were all ejected from the same weapon. The license plate number recorded by Farnsworth was registered to defendant's father. DNA found on a juice bottle and a cigarette located inside the house matched defendant.

(Doc. 16–31, PageID 2616–18).

On direct appeal, Moore claimed that his trial attorney, Marvin Barnett, had been ineffective and had a conflict of interest. The Michigan Court of Appeals rejected those claims and affirmed. *People v. Moore*, 2013 WL 514815 (Mich. App. 2013). Moore then retained Barnett to file an application for leave to appeal to the Michigan Supreme Court, but counsel did not file the application. (Doc. 6–3, PageID 122).

Rather, on October 23, 2013, Barnett filed motions for a new trial and an evidentiary hearing in the state trial court. (Doc. 6–4). The trial court, construing the filings together as a motion for relief from judgment under Mich. Ct. R. 6.502, denied the motion in January, 2014. (Doc. 6–5). Moore then filed a delayed application for leave to appeal to the Michigan Court of Appeals, but the court denied the request. (Doc. 6–7, PageID 165). The Michigan Supreme Court denied Moore's ensuing application for leave to appeal. *People v. Moore*, 860 N.W.2d 629 (2015) (mem.).

Moore, through newly retained counsel, filed the pending habeas petition in this court on September 21, 2015. (Doc. 1). He sought relief on one claim: a due process violation occurred when the jury deliberated while one member was absent. (*Id.*, PageID 4). Moore also filed, on November 20, 2015, a motion to stay his petition so that he could return to state court and litigate additional claims of ineffective assistance of trial counsel and newly discovered evidence. (Doc. 5).

The Warden moved for summary judgment on the ground that the petition was time-barred. (Doc. 4).

After these motions were fully briefed, the Honorable Denise Page Hood granted the motion to stay and denied the motion for summary judgment without prejudice. (Doc. 11).

Following his return to state court, where efforts to undo the convictions via a successive motion for relief for judgment were unsuccessful, Moore moved to reopen this case; Judge Hood granted that motion in February, 2019. (Docs. 12, 13).[1] In his post-reopening brief, Moore raised two additional grounds for habeas relief: 1) newly discovered evidence establishes that Moore is actually innocent; and 2) ineffective assistance of trial counsel for failing to conduct an adequate investigation into the case. (Doc. 12, PageID 268–280).

Respondent filed a renewed motion to dismiss the petition as untimely (Doc. 15), Moore responded (Doc. 17), and respondent replied (Doc. 19).

### Discussion

A one-year statute of limitations applies to a state prisoner's habeas petition. The limitations period begins to run on the latest of four dates:

---

[1] Because the judge who presided over Moore's trial has since become a District Judge on this court, the Sixth Circuit designated me to hear this case. (Doc. 14).

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D).

## A. Timeliness

### 1. The Petition Is Untimely Under § 2244(d)(1)(A)

The Michigan Court of Appeals affirmed Moore's convictions and sentences on February 12, 2013. *Moore*, *supra*, 2013 WL 514815. Moore then had fifty-six days in which to seek discretionary review in the Michigan Supreme Court, *see* Mich. Ct. R. 7.302(C), but it is undisputed that he did not seek such review. Accordingly, Moore's judgment of conviction "became final by . . . the expiration of the time for seeking [direct] review" on April 9, 2013, when the fifty-six-day period ran. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).

Resisting that conclusion, Moore appears to argue that the time for seeking direct review did not expire until an additional twenty-one days had lapsed, on April 30, 2013. (Doc. 17, PageID 3106–07).

Moore observes that Michigan law permits a defendant to file a motion for reconsideration within twenty-one days after the state appellate court issues its judgment. Mich. Ct. R. 7.305(C)(2). He then contends that the fifty-six-day window for seeking leave to appeal to

the Michigan Supreme Court would not start running until after the twenty-one-day reconsideration window had closed. (Doc. 17, PageID 3107).

This argument has no merit.

Michigan Court Rule 7.305 does provide that an application for leave to appeal must be filed in the Michigan Supreme Court fifty-six days after the date of either entry of the appellate court's judgment or "the Court of Appeals order denying a timely filed motion for reconsideration." But Moore did not seek such reconsideration, and the time for seeking direct review in the Michigan Supreme Court consequently expired on April 9, 2013, fifty-six days after the state appellate court's judgment.

Absent some form of tolling, Moore's habeas petition was due in this court on or before April 9, 2014. *Bronaugh v. Ohio*, 235 F.3d 280, 284–85 (6th Cir. 2000).

On October 23, 2013, Moore filed a motion for relief from judgment in the state trial court. This motion, which the Warden concedes was "a properly filed application for State post-conviction . . . review" under 28 U.S.C. § 2244(d)(2), tolled the limitations period. However, 196 days of untolled time had run between the start of the limitations period, on April 10, 2013, and the filing of the motion, leaving Moore with 169 days in which to file his federal petition.

Respondent does not dispute that postconviction proceedings remained pending until March 31, 2015, when the Michigan Supreme Court denied Moore's application for leave to appeal. (Doc. 6, PageID 108–09).

Moore contends, however, that postconviction proceedings remained pending for the twenty-one days in which he could have filed, but did not actually file, a motion for reconsideration of the state supreme court's order denying leave to appeal. (Doc. 7, PageID 183–84). This argument lacks merit in light of *Scarber v. Palmer*, 808 F.3d 1093, 1096 (6th Cir.

6

2015), which held that § 2244(d)(2) does not toll the statute of limitations during the three-week period in which a defendant could have moved, but did not move, for reconsideration of a Michigan Supreme Court order denying leave to appeal.

The hands on the one-year clock thus started to run again on April 1, 2015 and expired 169 days later, on September 17, 2015. Moore did not file his petition in this court until September 21, 2015, meaning that it was filed four days after the limitations period under § 2244(d)(1)(A) expired.

## 2. Part of the Petition Is Timely Under § 2244(d)(1)(D)

### a. Forfeiture

Moore's opposition brief does not argue that his original petition or either of his supplemental claims is timely under § 2244(d)(1)(D). (Doc. 17, PageID 3104–3113).

Because Moore's lawyer failed to raise this argument in response to the motion to dismiss, I would ordinarily consider Moore to have forfeited any argument based on § 2244(d)(1)(D). *See Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (party's failure to raise an argument in opposition to a dispositive motion in the district court results in forfeiture); *accord Broadus v. Jones*, 390 F. App'x 804, 807–08 (10th Cir. 2010) (petitioner forfeited argument that petition was timely under § 2244(d)(1)(B)–(D) by not raising argument in district court in opposition to warden's time-bar argument).

But several considerations have led me to overlook this forfeiture.

First, Judge Hood previously stayed this case so that Moore could return to the Michigan courts and exhaust his supplemental claims of newly discovered evidence and ineffective assistance of trial counsel. (Doc. 11, PageID 257–58). According to Moore's habeas attorney, moreover, those claims arose from counsel's "[r]ecent investigation" into Moore's case (Doc. 5,

7

PageID 52, 53) and depended on newly discovered evidence – namely, witnesses who prepared affidavits or declarations in 2015 (long after the limitations period began running under § 2244(d)(1)(A)) and had not testified at trial. (*Id.*, PageID 53–55).

While I am hard-pressed to understand why counsel failed to argue in response to the motion to dismiss that these claims are timely under § 2244(d)(1)(D), it is obvious that plausible – indeed, winning – arguments to that effect exist. To invoke forfeiture in these circumstances would only punish the client – and gravely, too, by forever foreclosing federal review of his claims – for his lawyer's errors.

Second, the potential applicability of § 2244(d)(1)(D) is so patently obvious from the record that respondent has no basis to complain that my raising the issue *sua sponte* is unforeseeable or prejudicial.

Indeed, despite the Warden's assertion in his reply brief that "Moore has *never* argued that 28 U.S.C. § 2244(d)(1)(D) . . . governs the start date of the period of limitations in this case (Doc. 19, PageID 3121) (emphasis supplied), Moore made exactly that argument – albeit in a purely conclusory fashion – in his surreply brief. There Moore argued, without elaboration, that "the basis of the claim to hold the petition in abeyance falls squarely within § 2244(d)(1)(D)," and that "[a]ll of the newly discovered evidence as set forth in the Exhibits attached to Moore's Response to the Motion for Summary Judgment undisputably [*sic*] fall within this statutory exception[.]" (Doc. 10, PageID 247).

These excerpts from the parties' briefs establish that both Moore and the Warden recognized that § 2244(d)(1)(D) was a part of the case, and, moreover, that notwithstanding the failure by habeas counsel to raise the issue, respondent had a fair opportunity to argue that § 2244(d)(1)(D) did not save Moore's petition or any of his claims.

Third, as I explain below, the briefs do not permit me to reach a reasoned decision whether Moore's claim that trial counsel was ineffective for failing to investigate and discover the West Virginia witnesses is timely under § 2244(d)(1)(D). Accordingly, both sides will have an opportunity to address the timeliness of that claim in the briefing schedule I set forth at the end of this order.

### b. Newly Discovered Evidence[2]

Moore's supplemental claim of newly discovered evidence of actual innocence (Doc. 12, PageID 269–73) does not state a cognizable ground for habeas relief. *Abernathy v. Campbell*, 2020 WL 532172, *4 (E.D. Mich. 2020) (Leitman, J.) ("claims of actual innocence based on newly-discovered evidence have not yet been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.") (internal quotation marks omitted).

Accordingly, in the absence of a proper "claim . . . presented" for habeas relief, there is no basis to find that Moore is entitled to a later start date under § 2244(d)(1)(D). *Cf. Keister v. Eberlin*, 2007 WL 4510218, *3 (N.D. Ohio 2007) (Gallas, M.J.) ("There is no need to consider whether to consider a stay under § 2244(d)(1)(D) because there is no cognizable claim presented.").

Rather, I will simply dismiss this claim as noncognizable.

---

[2] The first supplemental claim in Moore's post-reopening brief alleges that "habeas relief should be granted because newly discovered evidence constitutes compelling evidence of petitioner's innocence regarding an alibi, critical information establishing perjury by the key prosecution witness and is necessary to effectuate petitioner's constitutional right to due process, the right to present a defense and to trial by jury." (Doc. 12, PageID 268). As I understand Moore's pleading, it does not allege, as grounds for relief, that the prosecution knowingly introduced perjured testimony or that violations of Moore's rights to present a defense and a jury trial occurred. Because Moore's brief states only that that "this new evidence implicates several of Moore's constitutional rights" (*id.*, PageID 269), I do not consider any such claims to be before me.

### c. Ineffective Assistance

Moore's post-reopening brief alleges that trial counsel was ineffective for "failing to conduct *any* investigation for the defense, including family members and friends and family of the deceased, all of whom had critical evidence as to Moore's whereabouts at the time of the offense and background information of the prosecution's key witness." (Doc. 12, PageID 277) (emphasis in original).

There are three categories of evidence that Moore faults counsel for not discovering.[3]

First, Moore alleges that counsel failed to discover that his parents and older brother could have provided an alibi: namely, that Moore was with his parents and brother at his parents' home when Ferguson was killed.

I conclude that this trial-counsel claim is untimely, notwithstanding § 2244(d)(1)(D).

Assuming that counsel failed or refused to speak to Moore's parents and brother (as the family members claim in their affidavits), surely they would have told Moore this sometime before or during trial. At the very least, Moore – who knew that he was with his family, and not robbing Ferguson and participating in his murder, on the morning of September 4, 2010 – would have been aware of the factual predicate of this claim when counsel did not present an alibi at trial.

Because the factual predicate of this claim was available at trial, it is § 2244(d)(1)(A) that supplies the applicable start date for the limitations period, and the claim is untimely on that basis.

Second, Moore alleges that counsel failed to learn that three witnesses from West Virginia could have testified, *inter alia*, that Heather Farnsworth had a reputation as a liar, had

---

[3] I discuss this evidence in more detail below in the context of Moore's argument that I should excuse his untimely filing because he is actually innocent.

lied at Moore's trial about her lack of familiarity with the Detroit area, and may have been involved in the plan to rob Ferguson.

The record and briefs before me do not permit me to make an informed decision as to the timeliness of this claim.

When a court applies § 2244(d)(1)(D), "the petitioner bears the burden of proving that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of his claim, pursuant to 28 U.S.C. § 2244(d)(1)(D)." *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006). Because Moore has not made an argument under § 2244(d)(1)(D), I have no basis to find whether Moore exercised due diligence in discovering the existence of these witnesses and the information they could have provided. Accordingly, the parties must address this issue in further briefing.

Finally, Moore alleges that counsel failed to discover that a witness named David Carbin saw Moore leave the house at 10643 McKinney around 9:00 a.m. on September 4, 2010, several hours before Ferguson was killed. Carbin was also near the home several hours later when, after hearing gunfire, he saw two men – neither of whom was Moore – leave the house.

I conclude that the ineffective-assistance claim predicated on this omission is timely, as Moore could not reasonably have discovered Carbin's existence at any time before Carbin contacted Moore's family in early 2015. (Doc. 12–5).

As Carbin explains in his signed statement, he heard gunshots outside 10643 McKinney on September 4, 2010, but "did not think about it much" because "shots being fired in that neighborhood was not unusual." (Doc. 12–5, PageID 296). It was only sometime in early 2015 that he "came across a facebook page that described a shooting on McKinney[.]" (*Id.*). After Carbin "talked to a few people and learned more about the shooting," he realized the shooting

"was the same situation [he] had witnessed." (*Id.*). At that point Carbin "decided to contact the family of Vincent Moore," and Moore's family "sent a private investigator to take this statement/affidavit." (*Id.*, PageID 297).

Carbin was thus entirely unconnected to this case, and there is no basis in the record for supposing Moore knew or could have known about his account at any time before Carbin contacted Moore's family.

Carbin signed his statement on May 9, 2015 (Doc. 12–5, PageID 297), but the declaration does not say when he first contacted Moore's family.

This unresolved issue is immaterial, however, because Moore's postconviction proceedings were pending (and the limitations period was tolled) from October 23, 2013 until March 31, 2015. Assuming that Carbin contacted Moore's family sometime in late 2014 or early 2015, Moore would have had one year under § 2244(d)(1)(D) from those dates in which to raise an ineffective-assistance claim predicated on Carbin's statement. As respondent acknowledges, Moore raised his ineffective assistance claim in this court on "November 20, 2015, when he filed his motion to stay his petition." (Doc. 15, PageID 351).

Because Moore filed this claim within one year after he could have discovered Carbin's existence through the exercise of reasonable diligence, the claim is timely under § 2244(d)(1)(D).

### B. Equitable Tolling

"A petitioner is entitled to equitable tolling only if he establishes (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented a timely filing." *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 851 (6th Cir. 2017).

Moore contends that he is entitled to equitable tolling because the attorney he retained to file an application for leave to appeal with the Michigan Supreme Court on direct appeal (*i.e.*, his trial lawyer, Barnett) "abandoned his legal duty" and refused to seek such review. (Doc. 7, PageID 183). Instead, counsel initiated postconviction proceedings by moving for a new trial and an evidentiary hearing in the state trial court in October, 2013.

While attorney misconduct can support a claim for equitable tolling, *see Holland v. Florida*, 560 U.S. 631 (2010), tolling is not appropriate here because the misconduct did not actually prevent Moore from timely filing his petition.

Counsel's misconduct occurred even before the habeas limitations period began running. Consequently, the principal effect, *vis-à-vis* the limitations period, of counsel's failure to seek discretionary review in the Michigan Supreme Court was not the loss of untolled time. Rather, it was the starting of the one–year clock earlier than it might have otherwise begun. More importantly, it is undisputed that Moore still had 169 days (or about five-and-a-half months) to file his § 2254 petition once the state collateral review process that counsel had initiated ended.

On these facts there is no basis to find that counsel's refusal to seek direct review in the Michigan Supreme Court prevented Moore from timely filing his habeas petition. He is not entitled to equitable tolling.[4]

---

[4] In so holding, I do not intend to minimize the seriousness of counsel's misconduct. Indeed, I pause here to note the very troubling circumstance that, in May, 2015, Michigan bar authorities suspended Barnett from the practice of law for three years based, in part, on his conduct during Moore's trial. According to the suspension order, Barnett threatened to assassinate the prosecutor in Moore's case, verbally berated her on multiple occasions, and accused her of "cheating and lying for the white girls and white people[.]" (Doc. 5–2, PageID 77)

### C. Actual Innocence

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

"But this innocence gateway is a narrow one. The Supreme Court has cautioned that it should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Davis v. Bradshaw*, 900 F.3d 315, 326 (6th Cir. 2018).

"The touchstone of the inquiry is whether a petitioner's new evidence shows it is more likely than not that no reasonable juror would have convicted him." *Eberle v. Warden, Mansfield Corr. Inst.*, 532 F. App'x 605, 613 (6th Cir. 2013).

To make out a credible innocence claim, the petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

"Because a gateway-innocence claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Davis*, *supra*, 900 F.3d at 326. In making this assessment, I "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006). I must then make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*

### 1. Moore's New Evidence

Moore's new evidence of innocence falls into four general categories.

#### a. Carbin

First, he has introduced a statement from David Carbin. (Doc. 12–5).

Carbin claims that, around 9:00 a.m. on the morning of Ferguson's murder, he walked by the home at 10643 McKinney Street and saw Moore, whom he recognized as his friend's brother, exit the home, get into a small black car, and drive away. (*Id.*, PageID 295). When Carbin walked by the house "a couple or a few hours" later, he heard gunshots; ducked down; and saw two men, neither of whom was Moore, leave the house and get into a small silver or gray car. (*Id.*, PageID 295–96).

Carbin signed his statement in May, 2015, a few months after seeing a Facebook page describing the shooting and recounting Moore's conviction. (Doc. 12–5, PageID 296). When Carbin realized that the Facebook page was describing the shooting he had seen in 2010, he contacted Moore's family. (*Id.*, PageID 297).

#### b. West Virginia Witnesses

Moore has also introduced three affidavits from witnesses from West Virginia, where Farnsworth, Ferguson, and some of Moore's family lived.

Nicole Renee Hammons, an acquaintance of both Moore's and Farnsworth's, declared that Farnsworth had a reputation as a dishonest person. (Doc. 12–6, PageID 298). According to Hammons, Farnsworth was – contrary to her trial testimony – "quite familiar with Detroit," having made several trips there (including some in which she functioned as a drug mule). (*Id.*).

Penny Lynn Ferguson, the sister of the murder victim, went to high school with Farnsworth and got to know her better while Moore dated her. (Doc. 12–7, PageID 300).

She averred that Farnsworth "helped to arrange or 'set up' William's murder in order to split the money from the drug deal with the men who killed William." (Doc. 12–7, PageID 300). Penny stated that William and Farnsworth's relationship soured once William learned that Farnsworth was a drug addict. (*Id.*). After the murder, Penny claimed, Farnsworth told a man named Danny Bice that "she had the money and pills from the drug transaction." (*Id.*). Finally, Farnsworth's daughter allegedly told Penny that Farnsworth had dated "one of the men involved" in her brother's murder. (*Id.*, PageID 301).

Betty Jo Crittenden is the long-term partner of William Ferguson's brother Darrell. (Doc. 12–8). She doubted Farnsworth's claim that she and William were engaged to be married because William had not told anyone in his family about the engagement and "they did not behave as if they were in a loving, committed relationship." (*Id.*, PageID 302). Crittenden also believed that Farnsworth, whom she described as dishonest, was involved in William's murder. (*Id.*).

### c. Moore's Family

Moore has also provided affidavits from his parents and brother that detail an alibi they could have provided.

Moore's father, Vincent Moore Sr., testified that he saw Moore around 11:00 a.m. on the morning of the murder at Vincent Sr.'s house. (Doc. 12–9, PageID 304). According to Vincent Sr., Moore was behaving normally and "just seemed like Vincent." (*Id.*). Vincent Sr. "tried to provide these statements" to trial counsel, but counsel "was not receptive to this information." (*Id.*).

Moore's mother Lorine testified that Moore called her around 8:30 a.m. on the morning of the murder and told her he was at his house. (Doc. 12–10, PageID 306). Thereafter, Moore

came to her house "around 10:00 a.m. and 11:00 a.m." and stayed there until at least 1:30 p.m. (*Id.*). Like her husband, Lorine tried to share this information with trial counsel, but counsel was "not receptive" and "very unavailable to [Moore's] family during the trial process." (*Id.*).

Moore's brother Germaine stated that he was at his parents' house on the morning of the murder when Moore approached him around 11:30 a.m. and asked him some questions. (Doc. 12–11, PageID 308). Germaine saw that Moore was at their parents' home until 12:30 and 1:00 p.m. (*Id.*). Trial counsel was not interested in Germaine's information. (*Id.*).

### d. Avant

Finally, Moore introduced an affidavit from Michael Avant, an inmate in the Michigan Department of Corrections. (Doc. 17–2).

The affidavit, dated April 2, 2019, states that Avant was at a dice game in September, 2010 when he witnessed an argument between two men, Tez and Rowe. (Doc. 17–2, PageID 3116). When Rowe got mad because "Tez shot some dude in their house on McKinney," Tez said that Rowe "should be mad at Heather because she didn't say anything about the dude having a pistol." (*Id.*). Avant then heard Tez wonder if Heather would "tell on us," but Rowe said they did not need to worry because "[s]he blamed it on the weed man. Some dude she call Cuz, he in jail." (*Id.*).

Avant concluded by saying that he had not known that Moore was in prison for the shooting, and that Moore was innocent. (Doc. 17–2, PageID 3116).

### 2. Analysis

Having considered this evidence along with the trial evidence, I find that Moore has not proved by "clear and convincing evidence" that "no reasonable juror would have found" him guilty of felony murder. *Cleveland v. Bradshaw*, 693 F.3d 626, 632 (6th Cir. 2012).

The trial evidence convincingly established that Moore had, at an absolute minimum, set up a proposed drug deal with Ferguson and Farnsworth at the house on McKinney Street, which neighbors testified was a drug house.

The prosecution introduced phone records showing that Moore and Farnsworth had exchanged dozens of phone calls between August 29 and September 4, 2010. On the day before the murder, Moore called Farnsworth seventeen times, and Farnsworth called Moore nineteen times. On the day of the murder, Moore called Farnsworth at 6:38 a.m., 7:13 a.m., 10:07 a.m., 11:09 a.m., and 11:17 a.m., and Farnsworth called Moore at 9:36 a.m., 9:54 a.m., 9:55 a.m., and 9:56 a.m.

In addition, the phone logs showed that Moore had made many other calls on the evening of September 3 and the morning of September 4, which supports an inference that he was coordinating with the unknown confederates who were present during the killing.

Besides the pattern of intense communications with Farnsworth, the evidence suggested that Moore had tried to lead Ferguson, Farnsworth, and Breck to a part of Detroit they would be unfamiliar with. Both Farnsworth and Breck, whom police interviewed separately, testified that Moore led them from a Burger King, to a gas station, and finally to the house at 10643 McKinney. Such an inference squared with Farnsworth's trial testimony (and her statements to a 911 operator immediately after the killing) that she did not know where she was during the drug deal, and that Moore had led her to a trap.

Two witnesses – Farnsworth and Breck, who had traveled with her and Ferguson from West Virginia – testified that Moore was present at the McKinney Street house immediately before Ferguson was killed. Powerful circumstantial evidence corroborated those claims: investigators determined that Moore's DNA was on a cigarette butt and a juice bottle found at

18

the crime scene. Farnsworth testified, moreover, that she had seen Moore drinking from the juice bottle after he had emerged from the gas station with it.

On the other side of the ledger, Moore's new evidence is simply not sufficient to meet the demanding *Perkins*/*Schlup* standard.

First, a rational jury easily could – and most likely would – reject the family alibi as a falsified effort to exonerate a son and brother.

Although Moore's parents and brother all claimed to be in Moore's presence after 11:00 a.m., Farnsworth and Breck placed Moore at the McKinney Street house at this time. Moore's DNA on the juice bottle and cigarette butt also placed him there, albeit circumstantially. Perhaps more importantly, the phone records showed that Moore was still communicating with Farnsworth as late as 11:17 a.m., when he was supposedly with his family. If Moore truly had been with his family on the morning of September 4, and had had no involvement with the events that culminated in Ferguson's death, the presence of Farnsworth, Ferguson, and Breck (three West Virginia residents) in Detroit – not to mention the dozens of phone calls that Farnsworth and Moore had exchanged in recent days – would be entirely inexplicable.

Furthermore, the absence of any contemporaneous evidence showing that Moore's family tried to alert the authorities that Moore was innocent undermines the alibi's credibility. While the family members' affidavits say that they tried to tell counsel about the alibi, the affidavits are silent as to any other steps they might have taken to alert police, prosecutors, or the court to Moore's innocence.

Second, Carbin's account does not foreclose the possibility that Moore was in fact present for and participated in the robbery and murder.

Although Carbin stated that he saw Moore leave the house at 10643 McKinney around 9:00 a.m. on September 4, his statement does not mean that Moore could not have returned or did not return to the premises. Rather, when Carbin happened by the house again several hours later and heard gunshots, he saw two men (neither of whom, allegedly, was Moore) leaving. This is quite important because the prosecution never contended that Moore was the shooter, only that he had set up the robbery and thereby created a high probability of great bodily harm occurring to Ferguson. As the state trial court explained in its order denying Moore's successive motion for relief from judgment, because Moore "was not convicted of shooting the complainant, but was held responsible for setting up the shooting, his physical presence is not necessary to uphold his conviction for felony murder." (Doc. 16–36, PageID 2845).

Furthermore, a jury could reasonably discount Carbin's statement on the ground that he did not give his account until more than four years had passed. This is not to say that Carbin ought to have come forward sooner, but, rather, that the passage of time may have given the jury pause in crediting that account. Indeed, Carbin was not especially familiar with Moore, knowing him only as the brother of one of Carbin's friends.

Third, the evidence from the West Virginia witnesses, consisting for the most part of double-hearsay, speculation, and rumor, does not establish Moore's actual innocence.

Rather, if credited, the evidence of Farnsworth's reputation for being a liar would show only that Farnsworth was a liar – something that the defense emphasized during trial based on Farnsworth's lies to police about her own role in the proposed drug transaction.

As for Hammons's testimony that Farnsworth was quite familiar with Detroit, that is not inconsistent with Farnsworth's trial testimony that she did not know where Moore had led her on the morning of the murder.

Regarding Ferguson's sister's claim that Farnsworth returned from Detroit with cash and pills from the drug deal, there is no direct evidence to support this. Rather, Farnsworth allegedly admitted this to a man named Bice (whose connection to Farnsworth and Ferguson's sister is unexplained) who then shared the information with Penny Lynn Ferguson. This testimony, like the unexplained speculation that Farnsworth had set Moore up for Ferguson's murder, is not sufficiently reliable or trustworthy to compel a rational juror to acquit Moore.

Finally, Avant's testimony does not show that any reasonable juror would have voted to acquit Moore.

As the Warden persuasively argues (Doc. 19, PageID 3131), it is doubtful in the extreme that a rational jury would credit Avant's account – let alone vote to acquit based on it. Avant, at the time of his declaration a fellow inmate of the Michigan Department of Corrections, claims to have remembered a conversation from nine years earlier in which two strangers openly discussed murdering someone and framing an innocent man (Moore, allegedly) for the crime. Avant then remained silent about this matter until he happened to find himself incarcerated with the innocent man, at which point he came forward to declare Moore innocent. A reasonable jury could find that this evidence was simply too good to be true, especially given the circumstantial evidence placing Moore at the scene.

In sum, Moore's new evidence is insufficient to prove by clear and convincing evidence that no reasonable juror hearing it and the trial evidence would have voted to convict.

At best, the evidence would have set up one or more credibility questions: Who was telling the truth about Moore's whereabouts at the time of the crime, Farnsworth and Breck or Moore's family? How involved in the setup, if at all, was Farnsworth? Moore's evidence is not so trustworthy and reliable as to provide conclusive answers to these question. And the powerful

21

circumstantial evidence of guilt – the dozens of phone calls between Moore and Farnsworth, the presence of Moore's DNA on two items recovered at the crime scene, Farnsworth's having identified Moore's father's license plate on a car outside the McKinney Street home – would have permitted the jury to answer these questions in the prosecutor's favor and convict.

For all these reasons, I conclude that Moore has not satisfied the actual innocence standard, and that I cannot excuse his untimeliness under *Perkins*.

## Conclusion

It is, accordingly,

ORDERED THAT:

1.      Respondent's renewed motion to dismiss the petition for writ of habeas corpus under Habeas Rule 4 (Doc. 15) be, and the same hereby is, granted in part and denied in part as provided herein. Specifically, the court finds that the due process claim re. the absent juror and the ineffective-assistance claim based on Moore's alibi are untimely, that the ineffective-assistance claim based on Carbin's statement is timely, and that further briefing is needed to establish whether the ineffective-assistance claim based on the West Virginia witnesses is timely. The court dismisses the claim of newly discovered evidence of actual innocence as noncognizable.

2.      Petitioner shall file a brief in support of the petition for a writ of habeas corpus on or before June 19, 2020. Respondent shall file an answer/return of writ on or before August 3, 2020. Petitioner shall file a traverse on or before September 1, 2020. The parties must make all their arguments in favor of or against granting

the petition (timeliness, procedural default, the merits of the claims, etc.) in these briefs, as the court is not presently inclined to permit another round of briefing.

3.     Further scheduling held in abeyance pending adjudication of the petition for a writ of habeas corpus or at the request of either party.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
