# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**VINCENT L. MOORE, #816725**,

    Plaintiff,

File No. **2:15-cv-13319**

-vs-

Hon. **James G. Carr**

**THOMAS MACKIE, WARDEN,**

    Defendant.

| **CRAIG A. DALY, P.C. (P27539)** | **JOHN S. PALLAS (P42512)** | **LINUS R. BANGHART-LINN (P73230)** |
|---|---|---|
| Attorney for Petitioner Moore | Michigan Attorney General's Office | Michigan Attorney General's Office |
| 615 Griswold, Suite 820 | Appellate Division | Appellate Division |
| Detroit, Michigan 48226 | 525 West Ottawa St. | 525 West Ottawa St. |
| Phone: (313) 963-1455 | Lansing, Michigan 48909 | Lansing, Michigan 48909 |
| Email: 4bestdefense@sbcglobal.net | Phone: (517) 335-7650 | Phone: (517) 373-6225 |
| | Email: pallasj@michigan.gov | Email: banghart-linnl@michigan.gov |

# SUPPLEMENTAL BRIEF IN SUPPORT OF
# <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

## TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii-vi

STATEMENT OF QUESTIONS INVOLVED. . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-16

STANDARD FOR HABEAS REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-43

    I.     **PETITIONER MOORE WAS DEPRIVED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL REQUIRING HABEAS RELIEF FROM HIS STATE COURT CONVICTIONS**. . . . . . . . . . . . . . . . . . . . . . . . 20

RELIEF REQUESTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

*Barker v. Yukins, 199 F.3d 867, 876 (6th Cir. 1990),*
    *cert denied, 530 U.S. 1229 (2000).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Bell v. Cone, 535 U.S. 685, 694-696, 122 S. Ct. 1843,*
    *152 L. Ed.2d 914, 927 (2002).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Bies v. Sheldon, 775 F.3d 386, 395 (6th Cir. 2014).* . . . . . . . . . . . . . . . . . . . . . . . 18

*Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987).* . . . . . . . . . . . . . . . . 24, 30

*Byrd v. Skipper, 940 F.3d 248, 257 (2019).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Clinkscale v. Carter, 375 F.3d 430, 443 (6th Cir. 2004).* . . . . . . . . . . . . . . . . . . . . 24

*Combs v. Coyle, 205 F.3d 269, 287-88 (6th Cir. 2000).* . . . . . . . . . . . . . . . . . . 23, 24

*Cone v. Bell, 243 F.3d 961 (6th Cir. 2001).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984), cert denied,*
    *469 U.S. 1226, 105 S. Ct. 1221, 84 L. Ed. 2d 361 (1985).* . . . . . . . . . . . . . 24

*Cristine v. McKee, 526 F.3d 888, 897-98 (6th Cir. 2008).* . . . . . . . . . . . . . . . . . . 19

*Dicenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006).* . . . . . . . . . . . . . . . . . . . . . . . 37

*Dickerson v. Bagley, 453 F.3d 690, 696 (6th Cir. 2006).* . . . . . . . . . . . . . . . . . . . 23

*Ege v. Yukins, 485 F.3d 364 (6th Cir. 2007).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Evitts v. Lucy, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985).* . . . . . 42

*Ford v. Georgia, 498 U.S. 411, 423-24, 111 S. Ct. 850,*
    *121 L. Ed. 2d 935 (1991).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42

**Page**

*Granger v. Hurt*, 90 Fed. Appx. 97, 100 (6ᵗʰ Cir. 01/23/2004)................ 37

*Guilmette v. Howes*, 624 F.3d 286, 290-91 (6ᵗʰ Cir. 2010) (en banc). ...... 21, 39

*Hargrave v. McKee*, 248 Fed. Appx. 718 (6ᵗʰ Cir. 2007). ................ 18-19

*Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770,
    *178 L. Ed. 2d 624 (2011).* ....................................... 19

*James v. Kentucky*, 466 U.S. 341, 348-51, 104 S. Ct. 1830,
    *80 L. Ed. 2d 346 (1984).* ....................................... 42

*Jemison v. Foltz*, 672 F. Supp. 1002 (ED Mich. 1987)..................... 24

*Jordan v. Warden*, 675 F.3d 586, 592-93 (6ᵗʰ Cir. 2012)................... 19

*Lockhart v. Fretwell*, 506 U.S. 364, 369, 1113 S. Ct. 839,
    *122 L. Ed. 2d 180 (1993).* ...................................... 22

*Magana v. Hofbauer*, 263 F.3d 542, 550 (6ᵗʰ Cir. 2001). ................... 30

*Maples v. Stegall*, 340 F.3d 433, 436 (6ᵗʰ Cir. 2003)................ 18, 19, 30

*Matthews v. Abramajtys*, 319 F.3d 780, 790 (6ᵗʰ Cir. 2003). ............... 23

*McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6ᵗʰ Cir. 1996). .................. 22

*McKenzie v. Smith*, 326 F.3d 721, 727 (6ᵗʰ Cir. 2003)..................... 18

*Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7,
    *157 L. Ed.2d 263 (2003).* ....................................... 17

*Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639,
    *91 L. Ed. 2d 397 (1986).* ....................................... 42

*Paine v. Massie*, 339 F.3d 1194,1200 (10ᵗʰ Cir. 2003)..................... 23

**Page**

*Ratliff v. United States, 999 F.2d 1023, 1026 (6th Cir. 1993)*. . . . . . . . . . . . . . . . 42

*Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)*. . . . . . . . . . . . . . . . . . . 24

*Searcy v. Berghuis, 549 Fed. Appx. 357, 364 (6th Cir. 2013)*. . . . . . . . . . . . . . . 41

*Simmons v. Winn, Docket #12-13848, (Eastern District of Michigan,*
    Southern Division, Doc. #30, Pg. ID 2168, Hon. James G. Carr)*. . . . . . . 25

*Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . . . . . . 18

*Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992)*. . . . . . . . . . . . . . . . . . . 23

*Stermer v. Warren, 959 F.3d 704, 723 (6th Cir. 2020)*. . . . . . . . . . . . . . . . . . . . . 21

*Stewart v. Wolfenbarger, 468 F.3d 338, 356-61 (6th Cir. 2006)*. . . . . . . . . . . . . 25

*Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,*
    *80 L. Ed. 2d 674 (1984)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 42

*Tinsley v. Million, 399 F.3d 796, 802 (6th Cir. 2005)*. . . . . . . . . . . . . . . . . . . . . . 22

*Tolliver v. Sheets, 594 F.3d 900, 928 n 1 (6th Cir. 2010)*. . . . . . . . . . . . . . . . . . . 39

*Towns v. Smith, 395 F.3d 251, 259-60 (6th Cir. 2005)*. . . . . . . . . . . . . . . . . . 24, 25

*United States v. Kaufman, 109 F.3d 186 (3rd Cir. 1997)*. . . . . . . . . . . . . . . . . . . 24

*Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S. Ct. 316, 92 L. Ed. 309 (1948)*. . . 24

*Washington v. Hofbauer, 228 F.3d 689, 704 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . 23

*Webb v. Smith, 224 Mich App 203, 209 (1997)*. . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Wiggins v. Smith, 539 U.S. 510, 520, 534, 123 S. Ct. 2527,*
    *156 L. Ed.2d 471 (2003)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

**Page**

*Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S. Ct. 1495,
    146 L. Ed.2d 389 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams v. Ward,* 110 F.3d 1508 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . 24

*Willis v. Jones,* 329 Fed. Appx. 7 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 38

*Willis v. Smith,* 351 F.3d 741, 745 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 42

*Wilson v. Sellers,* __ U.S. __, 138 S. Ct. 1188, 1192,
    200 L. Ed. 2d 530 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ylst v. Nunemaker,* 501 U.S. 797, 805-06, 111 S. Ct. 2590,
    115 L. Ed. 2d 206 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATE CASES**

*People v. Boswell,* No. 228359, 2001 WL 1464533, at *1
    (Mich. Ct. App., Nov. 16, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

*People v. Bunton,* 2003 WL 21508500, *1-2 (Mich. App., 2003). . . . . . . . . . . . 40

*People v. Hermiz,* 235 Mich App 248, 254 (1999). . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Hunter,* 493 Mich 1015 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*People v. Manciel,* 499 Mich 889. 893-894 (2016). . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Moore,* 2013 WL 514815 (Mich App 2013). . . . . . . . . . . . . . . . . . . . . . 2

*People v. Moore,* 860 NW.2d 629 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Peters,* 205 Mich App 312, 316 (1994). . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Terrell,* 495 Mich 869 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Page**

**FEDERAL STATUTES**

*28 U.S.C. § 2254(d)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18
*28 U.S.C. §2254(e)(1)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**MICHIGAN STATUTES AND COURT RULES**

*MCL 750.316(1)(b)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
*MCL 750.529*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*MCR 6.508*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## <u>STATEMENT OF QUESTIONS INVOLVED</u>

**I.    WAS PETITIONER MOORE DEPRIVED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL REQUIRING HABEAS RELIEF FROM HIS STATE COURT CONVICTIONS?**

Petitioner answers "Yes"
Respondent answers "No"

## STATEMENT OF FACTS

### Procedural Background

Petitioner, VINCENT L. MOORE ("Moore"), is currently a prisoner of the State of Michigan, in custody of the Department of Corrections, presently incarcerated as Inmate #816725 at the Kinross Correctional Facility located at 4533 W. Industrial Park Drive, Kincheloe, Michigan 49788.

Respondent, THOMAS MACKIE, is employed by the Michigan Department of Corrections as the Warden of the Oaks Correctional Facility and is the State Officer who was legally responsible for Petitioner Moore's custody at the time the Petition for Writ of Habeas Corpus was filed.[1]

Petitioner Moore was convicted of First Degree Felony Murder, *MCL 750.316(1)(b)* and Armed Robbery, *MCL 750.529*, after a jury trial in the Wayne County Circuit Court, Detroit, Michigan.

On September 27, 2011, the Honorable Linda V. Parker, presiding, imposed the mandatory life sentence without parole, and 15 to 30 years, respectively.

The trial attorney was Marvin Barnett.

On his appeal as of right, the following claims were raised:

_____

[1]Moore currently is incarcerated at the Kinross Correctional Facility and Jack Kowalski is the warden and state officer legally responsible for Moore's custody.

I.    INEFFECTIVE ASSISTANCE OF COUNSEL DENIED DEFENDANT A FAIR TRIAL.

    A.    COUNSEL ENGAGED IN BIZARRE BEHAVIOR.

    B.    COUNSEL SHOWED HIS UTTER DISRESPECT FOR THE TRIAL JUDGE AND THE COURT.

    C.    COUNSEL WAS BURDENED BY THE ACTUAL CONFLICT OF INTEREST OF PROTECTING HIM-SELF.

On February 12, 2013, the Michigan Court of Appeals, in a per curiam unpublished opinion affirmed the convictions (Appendix, Exhibit A; *People v. Moore, 2013 WL 514815 (Mich App 2013)*).  The appellate attorney was Linda D. Asford.

Moore retained Barnett to file an appeal to the Michigan Supreme Court (Appendix, Exhibit A-1).  Instead, Barnett filed a Motion for New Trial and Evidentiary Hearing in the trial (Doc. #6-3, Pg. ID 122; Doc. #6-4).  The trial court denied the motion January 17, 2014 (Appendix, Exhibit B).

Reconsideration was denied (Appendix, Exhibit C).

A Delayed Application for Leave to Appeal, in the Michigan Court of Appeals was denied on July 2, 2014 (Doc. #6-7, Pg. ID 165) (Appendix, Exhibit D).

The Michigan Supreme Court denied leave to appeal on March 31, 2015. *People v. Moore, 860 NW.2d 629 (2015)* (Appendix, Exhibit E).

-2-

On September 21, 2015, Moore filed his Petition for Writ of Habeas Corpus (Doc. #1). Moore raised a single claim:

**I. PETITIONER'S SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE JURY DELIBERATED WITH ONE MEMBER ABSENT AND THE STATE COURTS REFUSED TO INVESTIGATE THE JURY MISCONDUCT.**

On November 20, 2015, Moore filed a Motion to Stay Proceedings to allow him to return to state court to address claims of ineffective assistance of counsel and newly discovered evidence (Doc. #5).

Respondent filed a Motion for Summary Judgment on the grounds that the petition was untimely (Doc. #4). Moore filed a response (Doc. #7).

The district court granted the motion to allow Moore to exhaust the additional claims and denied the Motion for Summary Judgment without prejudice (Doc. #11, Pg. ID 257-58).

On September 28, 2016, Moore filed his Motion for Relief of Judgment and for an Evidentiary hearing and Oral Argument in Wayne County Circuit Court.

Moore raised the following claims:

**I. A NEW TRIAL SHOULD BE ORDERED SINCE NEWLY DISCOVERED EVIDENCE IN THE FORM OF BOTH EYEWITNESS TESTIMONY AND CRITICAL BACK-GROUND INFORMATION ESTABLISHES THAT THE KEY PROSECUTION WITNESS WAS NOT CREDIBLE AND COMMITTED PERJURY AT TRIAL, AND TO**

**EFFECTUATE DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS, THE RIGHT TO PRESENT A DEFENSE AND TO TRIAL BY JURY.**

**II.      DEFENDANT MOORE WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

**III.     DEFENDANT MOORE IS ENTITLED TO RELIEF AND A NEW TRIAL.**

**IV.     DEFENDANT MOORE IS ENTITLED TO AN EVIDEN-TIARY HEARING.**

On February 14, 2017, the Circuit Court judge entered an Order Denying the Motion (Exhibit F, attached).

On December 21, 2017, the Michigan Court of Appeals dismissed a portion of the application and denied the remainder of the application (Exhibit O, attached).

On October 30, 2018, the Michigan Supreme Court denied leave to appeal (Exhibit P, attached).

On November 9, 2018, Moore filed a Supplemental Brief After Stay of Proceedings and Motion to Reopen Case (Doc. #12). Moore raised the following issues:

**I.       HABEAS RELIEF SHOULD BE GRANTED BECAUSE NEWLY DISCOVERED EVIDENCE CONSTITUTES COMPELLING EVIDENCE OF PETITIONER'S INNO-CENCE REGARDING AN ALIBI, CRITICAL INFORMA-TION ESTABLISHING PERJURY BY THE KEY PROSE-CUTION WITNESS AND IS NECESSARY TO EFFECTU-**

-4-

**ATE PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS, THE RIGHT TO PRESENT A DEFENSE AND TO TRIAL BY JURY.**

.

**II.     PETITIONER WAS DEPRIVED OF HIS SIXTH AMEND-MENT RIGHT TO EFFECTIVE ASSISTANCE OF COUN-SEL.**

**III.    THESE CLAIMS ARE NOT PROCEDURALLY DE-FAULTED.**

On February 8, 2019, the district court entered an Order Granting to Motion to Reopen the Case and to Supplement the Petition (Doc. #13).

On March 1, 2009, the Honorable James G. Carr was designated and the case was assigned to him (Doc. #14).

Respondent renewed its Motion to Dismiss on the grounds the petition was untimely (Doc. #15).

Moore filed his Response (Doc. #17).

On April 20, 2020, this Court entered an order, granting in part, and denying in part the Motion to Dismiss (Doc. #22).  In relevant part, the Court found that the due process claim, the ineffective assistance of counsel claim regarding Moore's alibi, were untimely and dismissed.  The Court further found that (1) the ineffective assistance claim based on Carbin's statement was timely, and (2) and further briefing

was needed to establish whether the ineffective assistance claim based on the West Virginia witness is timely (*id.*, Pg. ID 3162).[2]

### Factual Background

(At the outset, it should be noted that for purposes of this Petition the state appellate courts have not made a *factual determination* regarding the case itself.[3])

### Trial Evidence

By way of summary, this case involves the shooting death of William Ferguson ("Ferguson") on September 4, 2010. The prosecution alleged that Ferguson had traveled to Detroit from his hometown in Huntington, West Virginia with his girlfriend, Heather Farnsworth and Krystle Breck, to buy Oxycontin. Ferguson brought $14,000 to purchase the drugs and was robbed and shot for his money. The prosecution claimed that the Petitioner Moore ("Cuz") with the help of others, was responsible for the death of Ferguson during a drug deal. Two other unidentified gunmen actually shot and killed Ferguson at a vacant house on McKinney Street in Detroit. As a result, the prosecution charged Petitioner with First Degree Felony and

---

[2]A Motion to Extend the Time to File the Brief was granted (Doc. #23, Text-Only order).

[3]This Court's Order of April 20, 2020, Doc. #22, Pg. ID 3142-43 recites the "Background" of the case citing exclusively to the state prosecutor's Counter-Statement of facts from their Brief on the Appeal as of right to the Michigan Court of Appeals (Doc. #16-31, Pg. ID 2616-18). Moore's Statement of Facts on his appeal as of right can be found at Doc. #16-31, Pg. ID 2595-96).

Premeditated Murder, Armed Robbery and firearm offenses, concluding he was an aider and abettor.

The defense asserted that the prosecution witnesses were not credible, that a robbery never occurred, and that Ferguson was killed as a plan by an assailant, unconnected with Moore. The defense called no witnesses.

When the Detroit Police arrived at 10643 McKinney, Detroit, they met a female who said her boyfriend was shot inside the house (Tr. 8-26-11, p. 7-8, 31-32). Inside laying in the foyer was the deceased (*id*, p. 10, 32). There were shell casings in the living room and a loaded handgun magazine on the floor (*id*, p. 12-13, 40-41). The shell casings in the house indicated one long gun only had been fired (*id*, p. 50). There were bullet holes in the wall of the front of the house. The house was a vacant house with a small amount of furniture (*id*, p. 16). According to information received from witnesses at the scene, the shooting occurred at 12:00 o'clock noon (*id*, p. 19). Sylvester Wright, a neighbor, told police he heard gunshots and then saw two females exit the front door of the house where the shooting occurred (*id*, p. 21). Then two black males, one with an AK-47 exited the side of the house and got into a gray Chevy Impala and backed down Britain Street (*id*, p. 21-22). At the scene, Heather Farnsworth told the police that more than one weapon was involved (*id*, p. 40). She

gave a license plate number and vehicle description (*id*, p. 43). In response to that information, the police went to a house on Marlborough (*id*, p. 58).

Evidence technicians made a sketch of the scene, took photographs and seized evidence. Thirteen (13) shell casings and loaded firearm magazine were confiscated (*id*, p. 82-83). Also, a juice bottle was found in the living room (*id*, p. 84).

SYLVESTER WRIGHT, lived at the same intersection as 10643 McKinney and Britain, across the street from the scene (*id*, p. 101-102). He was sitting with Geneva Spencer-Haynes watching television around noon on September 4th (*id*, p. 102). When they heard shots, they immediately fell to the floor. When the shooting ended, Wright looked out and saw two slim guys with their hats pulled over their faces running to a car from the side door of the house (*id*, p. 103, 104). One of the men was carrying an AK rifle. The car, a Chevy Impala was parked in front of the house (*id*, p. 106). Then two females come out the front door and one said her boyfriend had been shot (*id*, p. 1018, 116). The Impala was at the house from 8:00 a.m. until the shooting (*id*, p. 113).

GENEVA SPENCER-HAYNES lived across the street from the McKinney house where the shooting occurred (*id*, p. 124). After hearing multiple gun shots, she also saw two guys running out the side door to a car (*id*, p. 126). Their faces were hidden by baseball caps and hoodies (*id*, p. 127). She described the men as tall and

-8-

light-skinned (*id*, p. 128).  One man had a AK-47.  The men got into a greyish Chevy Impala and drove off (*id*, p. 13).  Later, two white females come out the front door (*id*, p. 135).  Spencer-Haynes testified that there was somebody living in the house where the shooting occurred.  A large group of men would be on the porch every day (*id*, p. 140).

HEATHER FARNSWORTH, the girlfriend of Ferguson, lived with him in Huntington, West Virginia (Tr. 8-29-11, -5-6).  On September 4, 2010 they left West Virginia and came to Detroit to get Oxycontin from Petitioner Moore (*id*, p. 7-8).  Ferguson was to pay about $14,000 for the pills and Farnsworth would share in the proceeds (*id*, p. 10-11).  Ferguson and Farnsworth were to get the pills, return to Huntington and sell them at $35 a piece.  They had purchased pills from Petitioner five or six previous times (*id*, p. 12).  Krystle Breck, a friend of Farnsworth, came to Detroit with them (*id*, p. 14).  Ferguson and Farnsworth each had about half of the funds to buy the pills with (*id*, p. 15-16).  Farnsworth admitted lying to the police when she told them they came to Detroit to buy a truck (*id*, p. 18-19; 117).  Upon arriving in Detroit, they met Petitioner at a Burger King near Gratiot (*id*, p. 28).  Petitioner instructed them to follow him to a nearby gas station (*id*, p. 31).  From there, they drove to a house nearby where Petitioner ran inside for a minute and then returned to his car (*id*, p. 34).  They drove to another house and parked outside (*id*,

p. 36). They entered the house where a person inside was standing at the fireplace (*id*, p. 40-41). They all sat in the living room talking about prices and pills (*id*, p. 46). Farnsworth left to get cigarettes in her car and then texted the license plate to Petitioner's car to her phone (*id*, p. 47). Upon returning to the house, they counted out their money alone in a room and Ferguson put it all in his pocket (*id*, p. 49). Petitioner left the house saying he was going outside to get a blunt (*id*, p. 51). Three men then came in with long guns and the other man inside had a gun also (*id*, p. 53). The men ordered them to get down and struck Ferguson in the head (*id*, p. 54). The next thing she heard was a series of gunshots (*id*, p. 57). According to Farnsworth, she saw Petitioner running out with their money he took from Ferguson's pocket (*id*, p. 59-60). Petitioner had a gun in his hand when he took the money (*id*, p. 65). Farnsworth and Breck ran out the front door, while Ferguson was laying on the floor (*id*, p. 67-68). Outside, Farnsworth called 911 (*id*, p. 69). Petitioner's car was gone. At a photo lineup, Farnsworth identified Petitioner saying he was the one who brought her to the scene (*id*, p. 124-125). Farnsworth had previously been convicted of lying to a State Trooper and obstruction (*id*, p. 127-128).

On cross-examination, Farnsworth admitted lying to the jury when she testified she had been to Detroit only once before (*id*, p. 152). Farnsworth had sold and used oxycontin in the past (*id*, p. 162-163). Farnsworth never saw a Grey Impala at the

house, either before or after the shooting (*id*, p. 186; Tr. 08-30-11, p. 49). Farnsworth also testified that two black men ran at Ferguson and took money from his pocket on of which was Petitioner (*id*, p. 55). When the shooters came into the house, they did not demand any money and took nothing from Farnsworth (*id*, p. 107). According to Farnsworth, all four men involved ran toward the back of the house and none ran out the front door (*id*, p. 113). Although she saw Petitioner reaching for the money in Ferguson's pocket, she did not actually seem him take it (*id*, p. 118).

KRYSTLE BRECK lived in Huntington, West Virginia and came with Ferguson and Farnsworth to Detroit on September 4, 2010 (*id*, p. 166). Breck described it as a "road trip" to get out of her house (*id*, p. 68). While driving to Detroit, she was told they were going for a truck and pills (*id*, p. 169). Upon arriving in Detroit, they stopped at a Burger King, where they met Petitioner who was in a car with another individual (*id*, p. 171-172). Eventually, they followed Petitioner to a house where the two men entered (*id*, p. 175). They returned to their car and both cars drove to a second house (*id*, p. 176). They entered through the front door of the house (*id*, p. 179). They sat and talked for about 15 to 20 minutes (*id*, p. 182). After Ferguson and Farnsworth counted the money, petitioner appeared to make a phone call (*id*, p. 183-184). Petitioner then said he was leaving to get a blunt from the car and smoke it and asked if they also smoked (*id*, p. 186). Then Breck heard people

-11-

screaming "get down", "give me the money" and shooting (*id*, p. 187). At that point, Petitioner was gone, *id*. Ferguson entered the living room from the dining room and as he headed for the front door, he was shot (*id*, p. 190-191). Ferguson got up, walked further toward the door and all the men started shooting him (*id*, p. 193). The shooters left, but Breck did not know where they went (*id*, p. 194). Breck identified Petitioner from a photo array (*id*, p. 194). Breck told the police and previously testified that Petitioner left out the front door before the shooting occurred (*id*, p. 224-225; Tr. 08-31-2011, p. 26-27). Breck also previously admitted under oath to intentionally lying to the police, although she denied this at trial (*id*, p. 37). Breck also contradicted Farnsworth saying Ferguson had money in a wallet, while Farnsworth said he carried it a plastic gallon bag (*id*, p. 47-49). Breck did not see any money taken from Ferguson (*id*, p. 50) Breck also admitted withholding information from the police about buying pills to protect her friends (*id*, p. 68).

The deceased suffered four gunshot wounds which caused his death (*id*, p. 148, 157).

Bullet casings recovered from the scene were all fired from one firearm (Tr. 09-1-11, p. 157).

**Post-Conviction Evidence**

DAVID LAMONT CARBIN signed a sworn statement on May 9, 2015 (Appendix Exhibit G).  Carbin lived and worked out-of-state at the time of the affidavit, but had returned to Detroit for a funeral of his older sister.  In September 2010, Carbin lived in the area of the McKinney house where the shooting occurred.  On September 4, 2010, Carbin was walking from home to a friend's house on McKinney to get his hair braided.  At around 9:00 a.m., he saw Defendant Moore, a friend of Carbin's brother, leave 10643 McKinney in a small black foreign car.  After several hours, Carbin passed the McKinney house walking home when he heard gunshots.  Carbin saw only two men leave the house and enter a mid-sized silver or gray car.  The car with the two men drove off.  What Carbin did not know was that anyone was killed and did not consider it unusual to hear gunshots in the neighborhood.  A few months before his affidavit, Carbin saw a Facebook account of the shooting and discovered Defendant had been convicted.  Being certain that Defendant was not one of the two men who left the house after the shooting, he decided to contact Defendant's family.

VINCENT MOORE, SR., LORINE MOORE and GERMAINE MOORE have all signed sworn affidavits that Defendant Moore was at the family home at 4877 Marlborough Detroit at the time of the robbery/murder and therefore could not have committed the crimes he was convicted of (Appendix, Exhibit K, L, M).  These affidavits corroborate the evidence proffered by Carbin.

-13-

NICOLE RENEE HAMMONS signed her sworn affidavit on June 25, 2015 (Appendix, Exhibit H). Hammons knew Farnsworth as she also lived in Huntington, West Virginia. Hammons knew Farnsworth's reputation as a dishonest person, knew Farnsworth had lied "on many occasions," had seen Farnsworth steal and then lie about it, knew that Farnsworth had planned to do a drug deal with counterfeit money, and had been to Detroit several times as a "drug mule," had lied to Ferguson about a trip to Detroit and that Farnsworth was familiar with the Detroit area. This evidence would not only have attacked Farnsworth's credibility, it would have significantly undercut the States's case and supported evidence that Farnsworth was capable of setting up the robbery of Ferguson. As Hammons states in her affidavit, she lived in West Virginia at the time of Defendant's trial and was unaware of Farnsworth's perjury.

Finally, two relatives of Ferguson (the deceased) have provided affidavits supporting Defendant's theory that Farnsworth was the perpetrator of the robbery scheme and not Defendant. These affidavits were signed on November 18th and 19th, 2015.

PENNY LYNN FERGUSON, the sister of the deceased, William Ferguson, was acquainted with Farnsworth from high school and her relationship with her brother. Ms. Ferguson believes that Farnsworth was involved in a "set up" to kill her brother and split the money with the killers. Ms. Ferguson was aware of Farnsworth's drug addiction and that her brother was dating other women. She was aware of Farnsworth's

-14-

reputation as a liar and a thief. Of importance, when Farnsworth returned to West Virginia, she bad *both the money and the pills from the drug transaction in Detroit*. Additionally, when Ferguson was killed, Farnsworth never contacted his family to tell them of his death. Finally, Ms. Ferguson learned that Farnsworth had dated one of the men involved in Ferguson's death (Appendix, Exhibit I).

BETTY JO CRITTENDEN, the sister-in-law of Ferguson, was also aware that Farnsworth had a reputation as a dishonest person. Farnsworth lied at trial about her relationship with Williams, apparently to conceal her involvement. She was not Ferguson's fiancé and they were not engaged to be married. To the contrary, their relationship was "tumultuous" because of her drug addiction and disputes over money. Farnsworth had a motive to want Ferguson robbed to pay off her own drug debts. In fact, after the shooting, she returned to West Virginia and immediately began to sell off his possessions (Appendix, Exhibit J).

MICHAEL AVANT witnessed an argument at a dice game in September of 2010. The two individuals involved, were "Tez" and "Rowe." Rowe was mad at Tez because Tez shot "some dude" in "their" house on McKinney. Tez responded that Heather had not told him "dude" had a pistol and they were both lucky because the clip in the "dude's" gun fell out, otherwise he might have shot both of them. The two men then discussed whether Heather would tell on them. Rowe said she would not because she blamed it on the Weed man, that she called "Cuz," who was in jail.

Heather had been providing "updates" on the police investigation (Appendix, Exhibit N).

Petitioner has submitted his affidavit attesting to his innocence and unsuccessful attempts to have his trial lawyer, Mr. Barnett, to conduct any investigation in support of his defense and that he did not learn of the witnesses from West Virginia until 2015 (Appendix, Exhibit R).

## STANDARD FOR HABEAS REVIEW

Federal law imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

*28 U.S.C. § 2254(d)*.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7, 157 L. Ed.2d 263 (2003)* (per curiam) (quoting *Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000)*); see also *Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed.2d 914 (2002)*. "[T]he 'unreasonable application' prong of *§2254(d)(1)* permits a federal habeas court to 'grant the writ if the state court identifies the correct

governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed.2d 471 (2003)* (quoting *Williams, 529 U.S. at 413*); see also *Bell, 535 U.S. at 694*. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins, 539 U.S. at 520-21* (citations omitted); see also *Williams, 529 U.S. at 409*; *Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000)*.

However, when a state court fails to consider an issue or does not specifically address whether the alleged error constitutes a denial of a petitioner's federal constitutional rights, the deference due under *28 U.S.C. § 2254(d)* does not apply, and habeas review of such a claim is *de novo*. *Wiggins v. Smith, 539 U.S. at 534*; *McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir. 2003)*; *Bies v. Sheldon, 775 F.3d 386, 395 (6th Cir. 2014)*.

> The AEDPA standard of review applies only to habeas claims that are "adjudicated on the merits in State court proceedings." *28 U.S.C. §2254(d)*; *Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003)*; see also *Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)*. "When a habeas claim is not adjudicated in state court, we apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact." *Hargrave v. McKee, 248 Fed. Appx.*

718 (6th Cir. 2007) citing *Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003)*.

*Cristine v. McKee, 526 F.3d 888, 897-98 (6th Cir. 2008)*.

It is only when AEDPA, that is, when the state court's decision rejects petitioner's claim that the habeas court on the merits, that the state court's decision is entitled to significant deference.  *Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)*; *Jordan v. Warden, 675 F.3d 586, 592-93 (6th Cir. 2012)*.

The Supreme Court in *Richter*, credited a presumption that §2254(d) applies, even when there is no reasoned state court opinion addressing the claim, but only, "in the absence of any indication or state law procedural principles to the contrary."  562 U.S. at 99.

Finally, factual findings, *if any*, of a state court are presumed correct, unless those findings are erroneous by clear and convincing evidence.  *28 U.S.C. §2254(e) (1)*.

-19-

## **ARGUMENT**

I. **PETITIONER MOORE WAS DEPRIVED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL REQUIRING HABEAS RELIEF FROM HIS STATE COURT CONVICTIONS.**

Trial counsel, Marvin Barnett, failed to provide the minimal level of representation by failing to conduct *any investigation* into potential defense witnesses. These witnesses would have provided a substantial defense to support Moore's innocence and support Moore's theory that he was not involved in the robbery and murder. These witnesses would have also testified that the key prosecution witness, Heather Farnsworth, used Moore as a scape goat to avoid her culpability and was a habitual liar. Since Farnsworth was the only witness to implicate Moore in the robbery/murder, the attorney's failure to conduct the necessary investigation denied Moore his right to present a defense and to a fair trial because there is a reasonable probability of a different outcome at trial with these witnesses. This Court should grant the petition.

A. **REVIEW IS *DE NOVO* AND AEDPA DEFERENCE DOES NOT APPLY BECAUSE THE STATE COURT RELIED EXCLUSIVELY ON A PROCEDURAL BAR WITHOUT ADJUDICATION OF THE CLAIM ON THE MERITS.**

In his post-conviction motion in the trial court and on his appeals to the state courts, Moore raised two claims: Newly discovered evidence and ineffective assistance of counsel. The state trial judge explicitly refused to address the

-20-

ineffective assistance of counsel claim because of application of the rule of res judicata (Doc. #12-2, Pg. ID 292; Appendix, Exhibit F, pg. 7). Neither appellate court addressed the ineffective assistance claim and instead issued truncated short statements and referenced court rules. Thus, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers, __ U.S. __, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018)*; accord *Ylst v. Nunemaker, 501 U.S. 797, 805-06, 111 S. Ct. 2590, 115 L. Ed. 2d 206 (1991)*; *Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010) (en banc)*. Here, both the Michigan Court of Appeals and the Michigan Supreme Court denied Moore's ineffective assistance claim without a reasoned opinion, and therefore this Court looks to the state trial court's opinion. *Stermer v. Warren, 959 F.3d 704, 723 (6th Cir. 2020)*.

Since the state trial relied exclusively on a procedural bar, that is res judicata, asserting that the claim was previously litigated and therefore could not be raised again, there is no merits adjudication and no AEDPA deference. The review is *de novo*.

## B. CLEARLY ESTABLISH*ED FEDE*RAL LAW AS DETER-MINED BY THE SUPREME COURT.

It is well-settled that the right of a state criminal defendant to the effective assistance of counsel for his defense at trial is guaranteed by the Sixth and Fourteenth

Amendments to the United States Constitution. *Wiggins v. United States, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 471 (2003)*; *Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 674 (1984)*.

Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonable-ness under prevailing professional norms; (2) that there is a reasonable possibility that, but for counsel's error, the result of the proceedings would have been different or that the resultant proceedings were fundamentally unfair or unreliable. *Bell v. Cone, 535 U.S. 685, 694-696, 122 S. Ct. 1843, 52 L. Ed. 2d 914, 927 (2002)*. "[T]he focus, should be on whether the result of the trial was fundamentally unfair or unreliable." *Tinsley v. Million, 399 F.3d 796, 802 (6th Cir. 2005)*, quoting *Lockhart v. Fretwell, 506 U.S. 364, 369, 1113 S. Ct. 839, 122 L. Ed. 2d 180 (1993)*; *McQueen v. Scroggy, 99 F.3d 1302, 1311 (6th Cir. 1996)*.

The two part requirement of *Strickland*, deficient performance and prejudice test, requires a defendant to demonstrate that his attorney's performance, "fell below an objective standard of reasonableness" and "that there is a reasonable probability that . . . the result of the proceedings would have been different," but for his attorney's errors. *466 U.S. at 688, 694*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Id*. at 694. The Sixth Circuit in

-22-

*Matthews v. Abramajtys, 319 F.3d 780, 790 (6ᵗʰ Cir. 2003)* defined the term "reasonable probability," noting that "the evidence was not overwhelming, so that there is a reasonable probability of a different outcome with effective counsel." The Court added:

> Of course, a "reasonable probability" does not mean a certainty, or even a preponderant likelihood, *id at 694, 104 S. Ct. 2052.*

Regarding a claim of trial strategy a defendant must overcome the presumption that the challenged conduct or omission could be "considered sound trial strategy," *Strickland*, 466 U.S. at 689.  A mere claim of "trial strategy" cannot defeat a claim of ineffective assistance when the "strategy" is not reasonable or is a matter of negligence.  *Cone v. Bell, 243 F.3d 961 (6ᵗʰ Cir. 2001)*; *Combs v. Coyle, 205 F.3d 269 (6ᵗʰ Cir. 2000)*; *Paine v. Massie, 339 F.3d 1194,1200 (10ᵗʰ Cir. 2003)*.  *Washington v. Hofbauer, 228 F.3d 689, 704 (6ᵗʰ Cir. 2000)*.  *Strickland* makes clear that "strategic choices made after less than full investigation will not pass muster as an excuse when a full investigation would have revealed" helpful evidence.  *Dickerson v. Bagley, 453 F.3d 690, 696 (6ᵗʰ Cir. 2006)*.

## 1.    THE DUTY TO INVESTIGATE.

Proper investigation and preparation requires counsel to interview and produce the necessary witnesses and pursue other information which support a valid defense. *Sims v. Livesay, 970 F.2d 1575, 1580-81 (6ᵗʰ Cir. 1992)* (Counsel ineffective when

he knew of a potentially exculpatory gun residue report yet counsel failed to investigate adequately.); *Towns v. Smith, 395 F.3d 251 (6th Cir. 2005)*; *Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987)*; *Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)* (Counsel ineffective where he knows of another person's purported confession, but fails to investigate). A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make "an independent examination of the facts, circumstances, pleadings and laws involved . . ." *Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S. Ct. 316, 92 L. Ed. 309 (1948)*. This includes pursuing "all leads relevant to the merits of the case." *Blackburn v. Foltz, supra at 1183*; *Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984), cert denied, 469 U.S. 1226, 105 S. Ct. 1221, 84 L. Ed. 2d 361 (1985)*; *Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992)*; *Combs v. Coyle, 205 F.3d 269, 287-88 (6th Cir. 2000)*; *Clinkscale v. Carter, 375 F.3d 430, 443 (6th Cir. 2004)* (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance); *Jemison v. Foltz, 672 F. Supp. 1002 (ED Mich. 1987)*. The failure to adequately prepare and present a defense requires reversal. *United States v. Kaufman, 109 F.3d 186 (3rd Cir. 1997)*; *Williams v. Ward, 110 F.3d 1508 (10th Cir. 1997)*.

-24-

The failure to speak to witnesses by defense counsel can result in the grant of the writ. *Simmons v. Winn, Docket #12-13848*, Eastern District of Michigan, Southern Division, Doc. #30, Pg. ID 2168, Hon. James G. Carr, citing to *Towns v. Smith, 395 F.3d 251, 259-60 (6th Cir. 2005)*; *Stewart v. Wolfenbarger, 468 F.3d 338, 356-61 (6th Cir. 2006)*.

In the present case, the failure of defense counsel to investigate and speak to any defense witnesses was both objectively deficient performance that prejudiced Moore's right to a fair trial (Appendix, Exhibit R, Affidavit of Vincent Moore).

## 2.    DEFICIENT PERFORMANCE.

Each of the witnesses have proffered their testimony by way of affidavits or statements. Each were important witnesses that supported the defense theory and Moore's innocence. Yet Barnett made absolutely no effort to investigate or produce them for trial. Not a single witness was presented at trial for the defense. That failure was clearly deficient.

Barnett's overall conduct in this case exemplifies his strategy. The trial court threatened to hold him in contempt because he was so disrespectful and his behavior so distracting. During the trial, he lied about receiving both 911 calls, threatened the assistant prosecutor saying "there's about to be a couple more bodies up in here" and "if I have to chase you down, and then beat you from one end of this room to the

-25-

other, I will." (Tr. 08/05/14, pg. 393-396, 430-431) (Appendix, Exhibit Q, pg. 11).[4]

Barnett also told the prosecutor "Oh, I'm winning this case.  I promise you I'm going

to win this case.  I have out-lawyered you from one end of the courtroom to the next"

(Tr., 08/12/2015, pg. 538-39; Exhibit Q, pg. 11). Later, Barnett complained that the

assistant prosecutor had gone to her supervisor.  Barnett then said to her "You know

how many murderers I know?  I could have you assassinated" (*id*., pg. 12).  Barnett,

again denied threatening the assistant prosecutor, even though an officer present

responded, "Now that's a threat, back off."  Barnett accused the assistant prosecutor

of lying and cheating because she was allegedly protecting "white girls and white

people" (*id.*).  Ferguson, Farnsworth and Breck are white.  Barnett called one of the

officers "whiteman" and then berated the officer, saying he wins off stupid police

officers everyday.  Barnett complained that no one but Moore was charged.

When the prosecutor was conducting the direct examination of Farnsworth, he

told the judge he was not going to participate in the trial, he was "exercising *his* right

to remain silent" and he was "exercising *his* rights under the Sixth Amendment" (Tr.,

08/29/2011, pg. 123).  At another point, Barnett told the trial judge that he was "a

little crazy" and he had "staff here to keep me out of jail" (Tr., 09/01/2011, pg. 183).

---

[4]Barnett denied making the statement, although the assistant prosecutor and
two officers present confirmed Burnett said it (*id*).

The trial judge warned Barnett he would hold him in contempt for "impairing the authority or impeding the functioning of the court" (Tr., 08/30/2011, pg. 156-157).  Barnett later refused to conduct re-cross examination when offered by the trial judge, claiming he was exercising his first, sixth and 13th amendment rights against forced servitude (Tr., 08/30/2011, pg. 158-159).

While this conduct may not directly address Barnett's failure to investigate, it certainly exposes his trial strategy.  Intimidation and threats were the trial strategy and a cover for his incompetence.[5]  Barnett's conduct in this case, along with his unprofessional conduct in other cases, led to his suspension (*id*., pg. 32).[6]

Additionally, Barnett has engaged in a pattern of misconduct and failure to provide effective assistance of counsel by failing to investigate and present witnesses.[7]  The Michigan Supreme Court has twice rejected Barnett's explanation for his trial strategy for not conducting the required investigation and presentation of the defense, finding *Barnett was not credible*.  In both cases, the defendants were

---

[5]Several prospective jurors complained that Barnett was intimidating them (Tr., 08/24/2011, pg. 91-93).  Barnett told the jurors "its going to get crazy after this" and "its going to get worse than this" regarding his behavior (*id*., pg. 93-94).

[6]Exhibit Q, attached.

[7]Vincent Moore St., Lorine Moore and Germaine Moore have signed affidavits that Barnett rejected their attempts to provide information or to interview any witnesses regarding Moore's innocence (Exhibit J, K, L).

granted new trials based on Barnett's deficient performance.  *People v. Terrell, 495 Mich 869 (2013)*; *People v. Hunter, 493 Mich 1015 (2013)* (Appendix, Exhibits T and U).

In *Terrell*, Barnett testified that the client confessed to him but wanted to take the stand. Not wishing to "offer perjury", Barnett put him on the stand and asked him only if "he was a person?" And that was it. *People v. Terrell, 2013 Mich App Lexis 204*.  The Michigan Supreme Court found that testimony that the defendant confessed to him was not credible or to put it bluntly, Barnett committed perjury.

In *Hunter*, Barnett testified that he did not order a copy of the mistrial transcript before the second trial because he didn't think he would need it.  He refused to put on alibi witnesses after he could not "offer perjury" from the witness stand, and he also claimed defendant confessed to him so he did not  investigate the case further. *People v. Hunter, 2010 Mich App Lexis 1694.* Barnett's *Ginther* hearing testimony was found to be a complete fabrication.

Barnett was eventually suspended for three years based on other misconduct in other cases.  His conduct was described as follow in the notice of suspension from the practice of law by the Michigan Attorney Discipline Board:

> [He was found to have] engaged in conduct which involved dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conducts...reflects adversely on the lawyer's honesty, trustworthi- ness or fitness as a lawyer... engaged in conduct that is contrary to

-28-

> justice, ethics, honesty or good morals ... and engaged in conduct ...that violates a criminal law of a state and the United States ... which generally relates to threats and intimidation of witnesses.

This was quoted with approval by Michigan Supreme Court Justice Brian Zahra in a dissent from an order denying leave to appeal, *People v. Manciel, 499 Mich 889. 893-894 (2016)*. The notice of suspension can be found in fn 11 of the *Manciel* case (Appendix, Exhibit V).

That notice took effect on October 3, 2015.  A year later,  October 14, 2016, the attorney discipline board filed a 27-page formal complaint covering violations of the notice of suspension. Grievance Administrator v. Marvin Barnett, Case No. 16-118-GA.  The petition alleged Barnett lied to the Michigan Department of licensing, the Michigan State Bar, to other attorneys about his suspension, and to clients he took money from (Appendix, Exhibit W).  Barnett received a three year suspension on October 3, 2015, an 18 month suspension on October 4, 2018, and was eventually disbarred on January 3, 2019 (State of Michigan Attorney Discipline Board v. Marvin R. Barnett, P34033, Case No. 16-118-GA).

In *Byrd v. Skipper, 940 F.3d 248, 257 (2019)*, the Sixth Circuit granted habeas relief, stating:

> First, Barnett manifested a shocking lack of comprehension regarding the pertinent law in Byrd's case. This ignorance, coupled with the inaccurate advice he gave his client about the likelihood of his acquittal, is sufficient to deem Barnett's performance constitutionally inadequate.

See *Padilla, 559 U.S. at 369, 130 S. Ct. 1473* (noting an attorney's duty to give correct advice when the law is clear); *Maples v. Stegall, 340 F.3d 433, 439 (6th Cir. 2003)* (holding that "patently erroneous" advice falls below an objectively reasonable standard of assistance); *Magana, 263 F.3d at 550 (6th Cir. 2001)* ("[Counsel's] complete ignorance of the relevant law under which his client was charged, and his consequent gross misadvice to his client regarding the client's potential prison sentence, certainly fell below an objective standard of reasonableness under prevailing professional norms."); *Blackburn v. Foltz, 828 F.2d 1177, 1182 (6th Cir. 1987)* (holding that counsel's assistance was deficient where he displayed "a startling ignorance of the law").

Finally, Moore has attached his affidavit that Barnett failed to even discuss with him any investigation of any defense witnesses (Appendix, Exhibit R).

### 3. PREJUDICE.

#### (a) THE TRIAL.

At trial, the prosecutor argued that Moore set up a drug deal. She told the jury that the only question was *whether Moore participated in the robbery and murder* as an aider and abettor (Tr., 08/25/2011, pg. 127). It was undisputed that Moore was not the shooter and that all the shell casings found at the scene were from the same AK47 rifle. The defense conceded that Moore met Ferguson and Farnsworth, directed them to the McKinley house and entered it with them (Tr., 08/25/2011, pg. 160-161). The defense argued that Moore left before the shooting, had no weapon and never returned, that the shooting was "a hit," "an assassination" and that no money was

taken (*id.*, pg. 150-151, 153-154, 164).  The defense pointed the finger at Farnsworth as the person who planned the murder of Ferguson (*id.*, pg. 156).[8]

The *only* witness to testify that Moore was armed with a weapon and took money after the shooting was Farnsworth.  The other witness present, Krystal Breck, testified that Moore was not present during the shooting, and saw no one take anything from Ferguson (Tr., 08/30/2011, pg. 186-187; 08/31/2011, pg. 50). Farnsworth, an admitted liar, convicted felon for obstruction and lying and a drug addict, gave different accounts about the robbery.  At one point, she testified Moore "Cuz" took the money from Ferguson's pocket and ran out (08/29/2011, pg. 59).[9] However, she also told the police, two men ran up to Ferguson and took the money (Tr., 08/30/2011, pg. 55-560.  Finally, she said she did not actually see the money taken from Ferguson (*id.*, pg. 117-118).[10]  She did agree that Moore was not present during the shooting (08/30/2011, pg. 60, 106).  Farnsworth testified that all the men,

---

[8]In her closing argument, the prosecutor told the jury that the defense claimed Farnsworth was involved adding "And, look, its not entirely impossible" although the evidence did not support it. (Tr., 09/01/2011, pg. 173).

[9]When asked whether Moore was armed, she first responded, "I think.  I don't remember."  Her preliminary examination testimony indicated she said Moore had a "12 inch AKA") (*id.*, pg. 61-65).

[10]Farnsworth said no one asked for or demanded any money (*id.*, pg. 107).

including Moore, left out together in the same direction, out the back door when she heard the door slam (Tr. 08/29/2011, pg. 66).

Farnsworth also testified they arrived at the McKinney house before eleven o'clock at about 10:15 (Tr., 08/29/2011, pg. 186, 194). The final calls from Moore to Farnsworth were at 10:07, 11:09 and 11:17 (Tr., 09/01/2011, pg. 176). If Moore was at the McKinney house from the time they arrived until the shooting at 12:00 noon, why would Moore be calling Farnsworth? The phone records are consistent with Carbin's statement and Moore's innocence claim *that* he was not involved in the shooting and robbery.

Neighbors Sylvester Wright and Geneva Spencer-Haynes saw only two guys run out of the side door of the house, one holding an AK 47 rifle, shortly after hearing multiple gunshots (Tr., 08/26/2011, pg. 102-106, 126-128). The two men entered a grey Impala parked at the corner of McKinney and Britain, backed up around the corner and drove off (*id*., pg. 106, 101-132). Moore drove a black or blue four door vehicle (Tr., 08/29/2011, pg. 29). Nether Farnsworth of Breck were hurt and neither offered an explanation why. According to the police, the shooting occurred at 12:00 noon based o the witnesses report (Tr., 08/26/2011, pg. 18-19). A magazine with live bullets was found in the living room (*id*., pg. 46-47). Given the defense concession regarding Moore's contact with Farnsworth and taking them to the McKinney house

and entering it, the fact that Moore's DNA was found on an orange juice bottle inside and his cell phone calls with Farnsworth on the days before and on the day of the incident, did not advance the prosecutor's case. If anything the final cell phone calls were consistent with Moore's innocence. The prosecutor's case was clearly not overwhelming.

### (b)    POST-CONVICTION EVIDENCE.

### (1)    CARBIN

On the day of the shooting, Carbin lived about six blocks from 10643 McKinney. That morning, while walking on McKinney, he saw Moore, who was a friend of his brothers, walk out of 10643 McKinney, enter a small black car and drive off. Several hours later, he returned and while walking by, heard shots, and then saw two men exit the McKinney address, get into a midsized silver or grey car and drive off. Moore was not one of the two men and Moore's vehicle was not present. Carbin provides direct evidence that Moore had left long before the shooting and had not returned. Once Carbin became aware through facebook, that the incident involved a murder and Moore, he contacted the Moore family (Doc. #7-4, Pg. ID 199-201). Carbin *directly contradicts* Farnsworth claim that Moore was present and took money. It is also consistent with the testimony of Wright and Spence-Hayes. While it is always *possible* that Moore returned in the interim, his presence at the house

during the incident, and the allegation *he took the money from Ferguson*, was significant to the prosecutor's case. As the prosecutor told the jury, the question was whether Moore participated in the robbery and murder. Given the significant passage of time when Moore was last seen at the house, *and* the fact that Moore was not seen leaving after the shooting, supports Moore's contention that he was not involved and did not set up the robbery/murder. Carbin adequately explains the delay in reporting his knowledge, being unaware of the homicide and only knowing Moore as a friend of his brother. In any event, that issue would be left for the jury to decide.

### (2)    THE WEST VIRGINIA WITNESSES.

Three witnesses with intimate knowledge of Farnsworth, her relationship with Ferguson, her reputation as a liar and her conduct when she returned to West Virginia after the shooting which was consistent with the defense theory that she was the one responsible for Ferguson's death. The following evidence from these witnesses was significant to the defense that there was no robbery, that Farnsworth had set up the incident and needed Moore for a fall-guy as a cover-up:[11]

•    Farnsworth was not engaged to Ferguson, Ferguson's affection for her had dwindled and he was dating other women. Ferguson affidavit, Doc.

---

[11]The affidavits of Nicole Hammons, Penny Ferguson and Betty Jo Critten-den can be found at Doc. #7-5, 7-6, 7-7 and the Appendix, Exhibits H, I and J. A summary of the content of each affidavit is set forth in the State's Reply in Opposition to Petitioner's Answer (Doc. #9, Pg. ID 22-227).

-34-

7-6, Pg. ID 204-05; Crittenden Affidavit, Doc. #7-6, Pg. ID 206-07. This was contrary to Farnsworth testimony that they had a close relationship and were about to get married (Tr. 08/29/2011, pg. 6). Moreover, they had a tumultuous relationship over Farnsworth's drug use and money (Crittenden Affidavit, Pg. ID 206). This evidence supports the defense theory that Farnsworth had a motive to plan and participate in a robbery or "hit" on Ferguson and she lied about her relationship with Ferguson as a cover-up.

- Farnsworth needed money to support her lifestyle, in particular as a drug user. In fact, she had previously stolen from Ferguson.

- Farnsworth was a drug mule who had visited Detroit several times before the incident, contrary to her testimony she visited Detroit only once before for a funeral (Tr. 08/29/2011, pg. 13). This lie was part of Farnsworth ploy to portray herself as a victim in a strange land. (Ferguson Affidavit; Crittenden Affidavit). The fact that she had stolen from Ferguson and needed money was consistent with the defense.

- When Farnsworth returned to West Virginia, she avoided Ferguson's family, did not contact them or inform them about Ferguson's death and began to immediately sell off Ferguson's possessions (Ferguson

-35-

Affidavit; Crittenden Affidavit).  This evidence is also consistent with the defense.

- Farnsworth had a reputation as both a *liar and thief* (Hammons Affidavit; Ferguson Affidavit, Crittenden Affidavit). While Farnsworth admitted lying to the police about coming to Detroit only to buy a vehicle, this evidence goes far beyond her admission.  First, she had a reputation for lying.  Lying in specific instances is not the same as being a habitual liar.  The jury may have, following the jury instruction on credibility of a witness, that, "You are free to believe, all, none, or part of any person's testimony," three witnesses would testify that Farnsworth had a reputation as being dishonest, as well as a thief. (M. Crim. JI 3.6)  The jury was free to reject her testimony completely.[12]

It is the combination of this evidence that makes it more likely than not, that a reasonable juror would not have convicted Moore.  While the state would likely argue that these witnesses' credibility could be attacked, their evidence provides significant, non-cumulative evidence in support of the defense.  The issue of their

---

[12]Hearsay statements that Farnsworth lied and set up the crime, to convict a man who was innocent, or the witnesses belief in Farnsworth culpability would not be admissible at trial, unless there was the proper foundation and the evidence met the rules of evidence.

-36-

credibility is for the jury and only the jury.  *Barker v. Yukins, 199 F.3d 867, 876 (6th Cir. 1990), cert denied, 530 U.S. 1229 (2000)*.

### (3)    EVIDENCE FROM THE WEST VIRGINIA WITNESSES IS TIMELY.

§2244(D)(1)(d) requires Moore to show that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of the claim.  That section "does not require to maximum feasible diligence, only 'due', or reasonable, diligence."  *Granger v. Hurt, 90 Fed. Appx. 97, 100 (6th Cir. 01/23/2004)* (unpublished opinion).  In the present case, Moore was duly diligent in his attempts to secure witnesses from West Virginia.  He requested Barnett to investigate witnesses that would be helpful to his defense and had information about Farnsworth.  Barnett simply refused and precluded Moore from obtaining this evidence (Appendix, Exhibit R).  Moore's exercise of due diligence was only circumvented by Barnett's ineffective assistance of counsel.  Here, the impediment to the discovery of the evidence was his own attorney.  The question of due diligence is fact-specific and depends on various considerations, including conversations that the petitioner had with his counsel.  *Dicenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006)*.  It was left to Moore himself to undertake the investigatory and prepatory actions to locate and obtain the statements because of counsel's ineffectiveness.  Once Moore actually discovered the evidence he diligently pursued his rights,

obtaining an abeyance of his petition and pursuing the claims in state court, all in a timely fashion.  See *Willis v. Jones, 329 Fed. Appx. 7 (6th Cir. 2009)* (Due diligence established where petitioner where state had failed to disclose *Brady* evidence).  *Ege v. Yukins, 485 F.3d 364 (6th Cir. 2007)* (habeas clock begins when petitioner received evidence discrediting bite mark expert that testified against her).

## II.   THE INEFFECTIVE ASSISTANCE CLAIM IS NOT PROCEDURALLY DEFAULTED.

The procedural default doctrine has a well established four-part test.  A claim is procedurally defaulted where:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes, 624 F.3d 286, 290 (6th Cir. 2010) (en banc)* (quoting *Tolliver v. Sheets, 594 F.3d 900, 928 n 1 (6th Cir. 2010)*.

The state trial judge erroneously relied on the res judicata doctrine to avoid addressing the merits of the ineffective assistance of counsel claim.  This was simply wrong.  *MCR 6.508* does not provide for a procedural bar, and does not enforce a procedural bar, when a new "ground" is asserted, even when it encompasses a more broader, general issue, such as ineffective assistance of counsel.

The state court's ruling is clearly wrong, both factually and legally. *MCR 6.508(D)(2)* precludes relief only if the "grounds for relief . . . were decided against the defendant on direct appeal." (emphasis added).

The Michigan Court of Appeals in two unpublished opinions has specifically held that two distinct factual claims do not constitute the same "ground" even though the claim is based on the same legal theory.  In *People v. Boswell, No. 228359, 2001*

*WL 1464533, at \*1 (Mich. Ct. App., Nov. 16, 2001)* the Michigan Court of Appeals

rejected the prosecution's argument that *MCR 6.508(D)(2)* barred the defendant from

raising a new claim of ineffective assistance of counsel where he had raised a number

of ineffective assistance of counsel claims on direct appeal stating:

> The prosecution first argues that defendant's motion for relief from
> judgment was barred by MCR 6.508(D)(2) because defendant had raised
> the argument of ineffective assistance of counsel in a prior appeal.
> Indeed, this Court's review of defendant's prior appeals reflects that
> *defendant raised numerous ineffective assistance of counsel claims* and
> claim that the trial court erred by not questioning defendant and his
> brother about the joint legal representation. Petitioner asserts that *MCR
> 6.508(D)(2) does not preclude this particular appeal because he has not
> previously raised these exact issues*. Giving defendant the benefit of the
> doubt, *we can agree* that defendant did not previously argue that his
> representation by the same attorney who was defending his brother
> constitutes a conflict of interest (emphasis added) (Appendix, Exhibit
> X).

Likewise in *People v. Bunton, 2003 WL 21508500, \*1-2 (Mich. App., 2003)* the

Court held that *MCR 6.508(D)(2)* did not preclude a defendant's challenge of the

admission of her statement in her Motion for Relief From Judgment, notwithstanding

the fact that she also challenged the admission of her statement on direct appeal

because each was predicated on a distinct set of facts and circumstances:

> Petitioner did challenge the admission of her statement in her prior
> appeal to this Court. However, that challenge was based on a contention
> that the statement was coerced and not voluntary. Petitioner did not
> previously contend that her statement was the fruit of an illegal arrest.
> Therefore, the "ground for relief" asserted in this motion for relief from
> judgment is not the same as that asserted in her prior appeal. As a result,

*MCR 6.508(D)(2)* does not preclude relief on this ground.) (Appendix, Exhibit Y).

The Sixth Circuit Court of Appeals in its unpublished opinion in *Searcy v. Berghuis, 549 Fed. Appx. 357, 364 (6ᵗʰ Cir. 2013)*, relying in part upon the Michigan Court of Appeals unpublished decision in *Boswell* found that two distinct factual claims relying on the same legal theory ineffective assistance of counsel, are not the same ground under *MCR 6.508(D)(2)* precluding a finding that his claim was procedurally barred.

The trial court's reliance on the law of the case doctrine is also misplaced. The trial court cited to *People v. Peters, 205 Mich App 312, 316 (1994)*, which correctly stated that "the doctrine applies only to those questions specifically determined in the prior decision and to questions necessarily determined to arrive at the prior decision". Not only must the same specific question be involved, the same facts must have been adjudicated. *Webb v. Smith, 224 Mich App 203, 209 (1997)* ("The law of the case mandates that a court may not decide a legal question differently where the facts remain materially the same"); *People v. Hermiz, 235 Mich App 248, 254 (1999)*.

In short, the state cannot invoke the procedural default doctrine for this claim because the state court's reliance on the perceived procedural rule was not "a firmly established and regularly followed state practice . . . interposed by a state to prevent subsequent review . . . of a federal constitutional claim. *Ford v. Georgia, 498 U.S.*

-41-

*411, 423-24, 111 S. Ct. 850, 121 L. Ed. 2d 935 (1991)* (quoting *James v. Kentucky, 466 U.S. 341, 348-51, 104 S. Ct. 1830, 80 L. Ed. 2d 346 (1984)*. Alternatively, cause and prejudice to overcome any procedural default is established by ineffective assistance of appellate counsel and the actual merits of the claim. See, *Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)*.

A criminal defendant is guaranteed the right to effective assistance of appellate counsel on the defendant's appeal as of right. *Evitts v. Lucy, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985)*. A denial of the right to effective assistance of counsel, constitutes "cause" for the failure to raise the habeas claim on direct review. *Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)*; *Willis v. Smith, 351 F.3d 741, 745 (6th Cir. 2003)*; *Ratliff v. United States, 999 F.2d 1023, 1026 (6th Cir. 1993)*. A claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*.

In this case, the family of Mr. Moore hired trial counsel to file an appeal in the Michigan Supreme Court (Doc. #6-3, Pg. ID 122; Doc. #2, Pg. ID 3143) (Appendix, Exhibit A-1). The attorney, Mr. Barnett, did not file the appeal. Instead, he filed a Motion for New Trial in the trial court. Mr. Barnett was not about to raise any claim of ineffective assistance on himself. This is borne out by the fact that had he filed in

-42-

the Michigan Supreme Court, as he was hired to do, he was bound to raise the claims

of ineffective assistance raised in the Michigan Court of Appeals. That simply was

not going to happen. By taking over the appellate process, he effectively deprived

Moore of any possible ineffective assistance claim.

## <u>RELIEF REQUESTED</u>

**WHEREFORE**, for all the foregoing reasons, Petitioner Moore requests that

this Honorable Court grant his Petition for Writ of Habeas Corpus.

Respectfully submitted,

s/*Craig A. Daly*

**CRAIG A. DALY, P.C. (P27539)**
Attorney for Defendant Moore
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone:  (313) 963-1455
E-Mail:  4bestdefense@sbcglobal.net

Dated: September 9, 2020

-44-

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**VINCENT L. MOORE, #816725**,

    Plaintiff,

                                  File No. **2:15-cv-13319**

-vs-

                                  Hon. **James G. Carr**

**THOMAS MACKIE, WARDEN,**

    Defendant.

| CRAIG A. DALY, P.C. (P27539) | JOHN S. PALLAS (P42512) | LINUS R. BANGHART-LINN (P73230) |
|---|---|---|
| Attorney for Petitioner Moore | Michigan Attorney General's Office | Michigan Attorney General's Office |
| 615 Griswold, Suite 820 | Appellate Division | Appellate Division |
| Detroit, Michigan 48226 | 525 West Ottawa St. | 525 West Ottawa St. |
| Phone: (313) 963-1455 | Lansing, Michigan 48909 | Lansing, Michigan 48909 |
| Email: 4bestdefense@sbcglobal.net | Phone: (517) 335-7650 | Phone: (517) 373-6225 |
| | Email: pallas j@michigan.gov | Email: banghart-linnl@michigan.gov |

## CERTIFICATE OF SERVICE

    I, **CRAIG A. DALY, P.C.**, hereby certify that on the **9**th day of **September 2020**, I electronically filed **Supplemental Brief in Support of Petition for Writ of Habeas Corpus and Appendix** with the Clerk of the Court using the ECF system which will send notification of such filing to the following: **Hon. James C. Carr and Assistant Attorney Generals, John S. Pallas and Linus R. Banghart-Linn**.

                                 Respectfully submitted,

                                 s/*Craig A. Daly*

                                 **CRAIG A. DALY, P.C. (P27539)**
                                 Attorney for Petitioner Moore
                                 615 Griswold, Suite 820
                                 Detroit, Michigan 48226
                                 Phone: (313) 963-1455
                                 Fax: (313) 961-4315

Dated: September 9, 2020               E-Mail: 4bestdefense@sbcglobal.net